This case of the morning is N. Ray v. Estate of Wade. For the appellant, Mr. Tucker, and for the appellee, Mr. Hanson, you may proceed. Thank you, Your Honor. Court, please. I want to review for a few seconds the chronology of the documents. Obviously, the trust and its amendments are our concern, as well as the will. The original trust was March 22, 2001, with a million dollars to Susan in a $7 million estate. The guardianship was filed in May of 2001, a few months after that. The trust's first amendment was in May of 2002, which reduced Susan to $300,000. And the second amendment was January 12, 2004, which appointed Mercantile, which is the trust amendment which the trial court set aside. May 4, 2004 was the first codicil to the will, which the jury set aside. J. L., if I may, J. L. Wade, was 94 at his death in 2007. He was about 88 at the time of the guardianship, events. And to start out, I would like to discuss our motion to set aside the court's ruling as to the trust and first amendment to the trust and the jury's verdict on the will. Naturally, the standard is that all of the evidence must be viewed in a light most favorable to the respondent to the motion, a very familiar standard, so that unless we can say that the evidence so overwhelmingly favors movement, that no contrary verdict could stand. As we know, the evidence is entitled to its reasonable inferences. It has been said of this test that reasonable minds cannot differ, and the inferences must be reasonable. So to approach this difficult standard, I would say that we should step back and analyze the case perhaps in some broader terms. For the defendants, there were their expert witnesses, employees, acquaintances, pretty much the same categories of evidence as the plaintiff. I want to specifically discuss defendants experts Froman, Johnson, and Kingsley in connection with analyzing the evidence. Now, we know that those same witnesses vouched for J.L. at the guardianship in 2001. We also know that Judge Ortbaugh, in his orders and exhibit in the appendix, who heard the guardianship matter, first of all, found Mr. Wade to be disabled. And we think he rejected the testimony of those expert witnesses. He said in his order that they relied on J.L. And they did no independent verification. Yet in the trust contest, will contest trial, it appears to us that the trial court relied heavily on those witnesses, none of whom had had any contact with J.L. since the guardianship trial. In the guardianship trial, Judge Ortbaugh found moderate dementia. As I said, commenting on the expert's testimony, Ortbaugh said, they relied on J.L. with no independent verifications. In his order, which is in the appendix, Judge Ortbaugh found confusion. J.L. could not remember Mimi's name, his personal assistant, for decades. He did not remember doing the trust for the will. Now, this is in November of 2001, just eight months or so after the will prepared, was prepared. Ortbaugh found J.L. often non-responsive. And he re-ruled him to be a disabled person. And so, what is the impact of these things on the analysis of our motion? We would submit that we need to take that expert testimony out of this case. Ortbaugh heard the witnesses at the time of the guardianship trial. J.L. was there. And he, I would say, totally discounted them in his ruling. With the experts out of the equation, then we look again to see how we apply the standard and the test to what's left. A couple of employees, a couple of friends, and the Wade brothers, Courtney and Dr. Mike. And it's fascinating in the trial courts announcing her decision, which is in the appendix, on page A-14, I think. The trial judge, I'm searching for a word, I want to say, I should say castigated, I want to say gutted, Mike and Courtney. She said that they had zero credibility and their testimony was baloney. And part of that was they testified, perhaps, that they didn't detect any dementia or Alzheimer's. Well, if the trial judge says they're full of baloney, that may have some relevance to the standard on the request to set aside the court's ruling at A-14 of the appendix. I find the trial judge's comments about Dr. Mike and Courtney to be spectacular. In reviewing the discussion in her ruling, I'm looking for what evidence it is that really supports this ruling. And so, under the Pedrick standard, which for us is a very difficult standard, it appears to us that when you step away from a case and you think about the progression of the circumstances, which are in the record, and you have an opportunity to reflect on that a little more than you would at the conclusion of the trial, or perhaps even more than the jury would, it can certainly be heard that there is no credible evidence to support the trust ruling or the verdict on the will. Now, when you back away and look at this, it seems clear to us that the Alzheimer's started as far back, according to Dr. Day, as 1994. Susan testified that she began to see problems in 1999. And how do you explain this? How do you explain the facts of this case? Well, you have a gentleman who is getting old and beginning to suffer from dementia. He's a wonderful old gentleman, talented businessman, charming guy, and he has worshipped his daughter his entire life. There's no question about that. And then suddenly, she's an alcoholic. She's trying to take his business away. When she had worked in the business for some years, he does a 180. And she makes the perhaps unfortunate decision that she's going to file a guardianship. Well, she did. And the consequences are in the record. To move on then to the excluded transcripts, from the guardianship trial, our argument, petitioner and respondent's arguments have been about whether or not that's the same subject matter and so on. We had numerous witnesses which were excluded where they were deceased. And we had transcripts or depositions of relevant testimony. Jail's former attorney, Luke Grigsby, there were depositions that had been taken. He testified that he saw the deteriorating relationship early on. And that his mind was boggled over what Jail was doing. The Jail deposition from the guardianship was barred. And some of the things that he testified to in that deposition back in the summer of 01, just a few. When asked how old he was, this is August 23, 2001. That would be six months after the trust. Asked how old he was, he said, well, what details do you want? With respect to Susan and Tom had taken him to France to visit the places where he had been in the war, he did not remember that. When asked how long he was in the antenna business, he could not remember that. When asked if he had talked to Susan about her desires for the company, he said, no. Unfortunately, we haven't had that kind of business. And that's something that, of course, we wanted because it simply wasn't true. And we showed it. In fact, I'm sure we presented evidence during the case on that point. He did not know doctors Kingsley, Froman, or Johnson on August 23 when his deposition was taken. He could not recall having made a new will in the last year. This is in August. The will and trust were in March, and so on. His deposition from the guardianship trial replete with that sort of evidence. It seemed to us relevant and important in our case, but it was not allowed. In addition, there was a CD-ROM of his deposition, which neither the jury nor the judge, the jury was not allowed to see, and the judge would not consider it. And so those are the questions on the excluded evidence. There's an interesting witness who has, is totally independent, who I thought said some very important things. And that's Walker Philbert, an attorney in Pittsfield who was appointed in 03 and 04 as J.L.'s guardian ad litem in the guardianship. And he interviewed J.L. And he said he had nine stories that he would repeat. And Mr. Philbert had very careful notes on these, but he had nine stories that he would repeat. One of them was that Susan wanted to take over the business. When Mr. Philbert was involved from I think October of 03 to maybe May of 04, of course by that time it's a couple of years after the trust, but in any event, he was perseverating. He, when Philbert asked him who his attorney was, he stated he did not have an attorney. He was unable to answer Philbert when Philbert asked him whether he wanted his assets to be controlled by Bank of America. Bank of America was the original trustee, original successor trustee after J.L. resigned. His evidence, sure, it's in 03, late 03. But it is important to recognize how far this man had advanced by then as a reflection, an extrapolation perhaps, on what his condition was in March of 2001. Now contest cases like this, you have to prove them by the best circumstances you can find, and they're not always, you know, on the day the will of trust was signed. And so the point of Philbert's testimony is that by the time he was involved, J.L. was way along in this Alzheimer's process. We also make a point about instruction two. The significance of instruction two is we wanted the attorney who was involved to be included in that instruction on undue influence. The instruction didn't follow the Hoover case, which is a Supreme Court case that essentially, the biggest thing I think it says is that the influencers do not necessarily have to be beneficiaries. In the Hoover case, Robert got cut out at the instigation of Nancy and her crowd, all of whom were not beneficiaries. And it was not unlike this case where the petitioner here is saying, you turned my father against me. And when you back away from this case, that's the only explanation of what happened here. We also urge that the defendants did not overcome the presumption of undue influence. Mimi Fitz, the jury... Let me finish that thought that your time has expired. Thank you very much. Finishing the thought then, Mimi fits the mold for confidential relationship, no question about it. And they had a responsibility to overcome that presumption, and we argue in our brief that they did not. Thank you very much. We'll hear from you on rebuttal. Thank you. Good morning, counsel, court. I'm just going to follow my brief and my response. I'm not going to reissue a bunch of the facts. It's in there. This is a case that took three weeks to try. I've been involved with it since Mr. Wade died in 2007, and here we are eight years later. The trial was three weeks long, and much of what I've heard this morning Mr. Tucker has argued at least twice, if not three times already. First, in response to the brief, as to jury instruction number two, our first argument is that issue that's been brought before you has been waived. Mr. Tucker did not raise that in his post-trial motion, and, in fact, he only raised 200.03, 200.3, excuse me, and not 200.4. And the Schultz case, which we cite, says, look, there's not much that you need to comply with the rule, but you've got to have more than what he had on 200.3. Now we see 200.4 wasn't even raised in the post-trial motion. We think that's waived based on Supreme Court Rule 366. Interestingly enough, in the reply brief, Mr. Tucker, I wrote down, but they didn't want to weigh the file down with further pages, so they didn't put anything in there on 200.4 because they thought the court had enough. I'm sorry he didn't feel the need to do that. As such, he's waived that argument here today before you. If the court feels that he did not waive that argument, first I would say it's an abuse of discretion standard, not what the petitioner here has put into her brief. So in looking at that, were the instructions taken as a whole sufficiently clear so as not to mislead and fairly incorrectly state the law? There's some citation in our brief about what the court and Judge Legowski stated about Mr. Keller. That's who Mr. Tucker is asking the instructions that have included. Mr. Keller, who was a partner of mine and has since retired, was the attorney for J.L. Wade. And as Judge Legowski stated, she found nothing by way of any of the evidence that had been presented that Mr. Keller should have been included in the instruction, even under the Hoover standard, which the argument was made on behalf of Ms. Barr. So I think that's already been addressed. I don't think there's anything that shows in the brief or the record that, taken as a whole, the instructions did not fairly and correctly state the law or inform the jury and were in any way misleading. As to the next point on the improperly excluded evidence based on the limitation period, and what I'm focusing on here is the May 4, 2004 date, which was the last document executed by Mr. Wade. Their brief indicates that there was something excluded previous to that date. We raised the point that there was nothing in the trial or the record that was excluded, other than what I'll get to later on the guardianship testimony. But nothing that the plaintiff in the case wanted in was excluded. So I think what we're focusing on here is the offers of proof made for anything after May 4, 2004. As the Court is aware from our briefs, the standard is, either under undue influence or whether he lacked testamentary capacity, it is at the time that the documents were executed. That is the time that governs. The Court has within its discretion to allow after-period evidence to come in. In our motion in Limine, that was granted that nothing after May 4 would come in, but Mr. Tucker was given every opportunity to make offers of proof. He did. The Court didn't find them compelling. Much of his offers of proof were for the time period of 2006 and 2007. In fact, you'll see in the record there were witnesses that were called that flew out to see Mr. Wade shortly before he died. The Court found that evidence not to be probative to whether or not at the time, for instance, the will was executed, whether or not Mr. Wade had the sufficient mental capacity to know his objects and his property and to form an intent to dispose of those. So, after May 4, 2004, the Court ruled on that. The offers of proof did not come in, and under the abuse of discretion standard, we think they have failed to meet their burden to show, not only at that level, but here, why anything was improperly excluded. What I heard this morning was talking about Walker Filbert. I agree 100%. Walker Filbert was the guardian ad litem as of October 2003, and Mr. Tucker can get up here and tell you again, everything he testified to is in the record. He wasn't excluded. So the jury and the Court has already heard that, that that wasn't kept out. In fact, Brett Irving, who was the guardian ad litem prior to Mr. Filbert, came in and testified. So, we had all sorts of testimony about everything up to May 4, 2004. The only thing that they're arguing is things excluded. After that, the Court was not persuaded. As to the exclusion of the witness testimony from the guardianship trials, as Mr. Tucker said, the evidence they wanted to get in a trial was of deceased persons who participated in the guardianship hearing in 2001. That's six years prior to the date Mr. Wade died. The standards in the guardianship hearing and in the Will and Trust are totally different. I think what they were trying to do at trial, and trying to argue here, is to bootstrap Supreme Court Rule 212, which allows, by way of example, I file a civil action. I then voluntarily dismiss that two years after I've started doing discovery and depositions, and we've taken discovery depositions, but then I refile. The Court is allowed, in the interest of justice and expediency, to say, hey look, we're going to allow those discovery depositions that were used in your prior matter to come in now in this matter because it's the same case, the same standard, the same burden, the same witnesses. What we have here is a different standard in the guardianship hearing than in the Will and Trust movement to set that aside. Did we have a fair opportunity to examine those witnesses at that time? No, not in a discovery deposition. I've handled hundreds, if not thousands, of discovery depositions. I can tell you the amount of times I've asked my client questions in a discovery deposition, I can count on one hand. So what the plaintiff is arguing is, from now on, if this goes, I have to make sure that I think ahead that anything that might be asked in one proceeding, when this person dies, I better try and cover myself here if they contest the Will and Trust later. That's not what the rule is meant to handle, and that's not what practice is all about. It would be like saying, hey, you know what? In a crude example, in an adoption case, if there's a deposition, I better make sure to ask my client because what if they get divorced later on? Are they going to use that deposition against me in the divorce? I would tell you that my argument is Rule 212 doesn't allow for that. It wasn't the same subject matter, not the same action, and not the same burden of proof. So I think the court properly excluded that evidence after the arguments were made, and did not abuse its discretion in doing so. As to the motions for directed verdict, counsel spent most of his time this morning arguing that and reiterating findings from Judge Ortbaugh in the guardianship hearing from 2001. The order was an exhibit at trial. Everything about Judge Ortbaugh's ruling and what he said was an exhibit that went to the jury. He argued it back then. He's re-arguing it now. And what he's doing is making arguments on evidence, which is what the trier of fact is the gatekeeper of, and the jury is the gatekeeper of. Standing up here before you and arguing about evidence on expert witnesses, etc., well, that's what we had three weeks of trial for. And we put on witnesses. They put on witnesses. The jury is the ultimate decider of who is credible and who is not on the issues that they heard with regard to the will. And Judge Lugoski did the same with regard to the trust. As far as the judgment notwithstanding the verdict on the presumption of undue influence, he's filed two issues before you on his brief. One is on the bursting bubble theory, which I would say, yes, I agree that the plaintiff has to make a case on each element under undue influence, which is the fiduciary relationship, trust and confidence, the beneficiary procured the will or prepared the will, and that the beneficiary received substantial benefit. The evidence which is before you goes mainly to their arguments on Mimi and Mr. Keller. Mimi was jail's housekeeper, caretaker, and she received a benefit under the documents that were upheld by the court and the jury. Her benefit was a house in Arizona and $100,000 cash. His argument is that by the fact she drove this man to an appointment, she helped prepare or procure the will. As I stated in our brief, that just flies in the face of common sense, that anybody who drives somebody who can't drive to an appointment faces an undue influence charge if they change their will. Mimi didn't prepare or procure the will, as Judge Lugoski stated in her reasoning. On the flip side, as to Mr. Keller, he didn't receive a benefit. There's cases upon cases that say the fact that you're an attorney and you generate legal fees procuring someone's will does not mean you've unduly influenced them or received a benefit under this theory. So once we put forth all the evidence about... I mean, Mr. Keller testified for hours. I mean, he was on the stand probably for, two years ago, probably five, six hours. He went through memo after memo after memo of his six meetings with Mr. Wade that occurred prior to Mr. Wade even signing a document. Mr. Wade had questions about taxes, implications about funding a foundation. In fact, Mr. Wade wanted to cut Susan out of the will entirely, entirely. Mr. Keller offered him some other alternatives. So I certainly would tell you that the evidence was refuted as to the presumption. Once that bubble bursts, they have the burden. The ultimate burden never shifts to the defendant in that case, and they fail to meet it. As to the judgment notwithstanding the verdict on everything in its entirety, you know, this case, as I argued then, was one in which, you know, I think we have a child trying to dictate what a parent does as to the property and wealth that that parent has accumulated over years of hard work. Unfortunately for Ms. Barr, there were a few triggering events that led to the ultimate outcome that we're here for today. Mr. Wade was a proud man, and he was a very smart businessman. The guy was a marketing genius, and to take the antenna business and Purple Martin birdhouses and amass the fortune he did says something about the kind of guy he was. But she went after him, and she threatened his authority, and the minute she found that guardianship action, she went in, went into his business, changed the locks, changed the keys, threw him out, and he didn't like it. And as the testimony stated, you know, he told Mr. Keller that Mr. Keller testified to, you know, Bill, I hope you never have a child who does to you what she's done to me. And he certainly, you know, was hurt by that. She ran a newspaper article in the local paper about wanting to buy property that, you know, was his. And even at trial, she said, when I asked her point blank, you would agree with me that everything you did backfired against you? She said yes. And here we are today, and unfortunately, you have to take responsibility for your actions. And in this case, that meant Mr. Wade changed her, changed her inheritance. The testimony, which went on and on for three weeks, talked all about that. He even had to evict her from his own property. We were up here before you, we've been here before you in this court at least three other times. That was one of them. And, you know, the experts got up and they testified. Mr. Day, the plaintiff's expert, Judge Legowski didn't find him credible because he never even saw the man. In fact, he was treating Ms. Barr. Ms. Velez, you can read what Judge Legowski said about her. So my point in all of that is there was evidence on both sides for a long period of time. And when you look at the standard, what they are arguing is, based on that evidence, everything has to go in my favor right now as I sit here before you, all inferences and reasonable doubts go to me, that no other verdict could ever stand, ever. And I would say to you today that that just isn't the case. And that's why we put on three weeks of evidence and the jury decided what it did. In fact, you know, they set aside the 2004 codicil and the 2004 Second Amendment to the Trust. So they certainly paid attention for three weeks. Judge Legowski, I'm sorry, the jury set aside the codicil. Judge Legowski set aside the Second Amendment to the Trust. So as far as the jury verdict goes, that's what they're there to do. They weighed the evidence, they heard the evidence, and they came to their decision. So that being said, I think the trial court was proper in its rulings. I would state to you here today that our position is that we ask you to deny the appeal, to uphold the verdicts and the judgment at the lower court level. And the only thing is I'm not going to really raise any argument on my last point on the motion for mistrial. I think it's stated in my brief. It was one question. The objection came in. I've cited cases where closing arguments had things about killing the plaintiff and frivolous defense and all sorts of stuff. So I think it's a case of, obviously, she didn't get the results she wanted. She being Ms. Barr. And while that may be hard for her to deal with, she had her day in court and we had three weeks of trial, and it's time to move on, I think. And I would ask that you deny the appeal. Thank you. Thank you, counsel. Mr. Tucker, your rebuttal. Yes, sir. Thank you. I'd like to start with my ending, to be certain I get it in. You know, the respondent argues that all of this problem about jail is because of her conduct. We have dealt with that in this case from the beginning. Blame Susan. Blame Susan. Blame Susan. I have three words in this case that are hard to explain describing what happened. The words are gatekeeper, keep away, and shut out. There is absolutely no question that Mimi was the gatekeeper and that she excluded Susan from jail's line. The effect of this was to keep her away and to shut her out. Well, if jail's problem was with Susan's conduct, why would they do that? Why would they keep her away? What was the motive here? Was it to keep the documents as they are so that there was no opportunity for her to reconcile with her father? We think that that is an explanation. We did not waive the claim on jury instruction number two. It's included in our post-judgment motion. We had a two-part post-judgment motion, one pertaining to the trust and the judge's rulings on that, and the second part pertaining to the jury. And in the jury section at 833 of the appendix, paragraph three, we raised that. It had been argued at great length during the jury instruction conference in the trial, and I think we alluded to that in our brief. The argument about the excluded evidence comes under Evidence Rule 804, as we have included the argument in Appendix 37 of our brief and made it part of the brief. We think the keep-away game is very telling. Why would Mimi Keller and Courtney and Michael be engaged in this course of conduct over years, keeping her away from her father? Thank you very much. Thank you, counsel. We'll take the matter under advisement. With readiness for the next case.